# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

FINJAN LLC,

*Plaintiff-Appellant*,

v.

PALO ALTO NETWORKS, INC.,

*Defendant-Appellee*.

Appeal from the U.S. District Court for the Northern District of California,
No. 3:14-cv-04908-RS, Hon. Richard Seeborg

## PALO ALTO NETWORKS, INC.'S RESPONSE BRIEF (NON-CONFIDENTIAL)

TIMOTHY CHEN SAULSBURY
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

KYLE W.K. MOONEY
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

BRIAN R. MATSUI
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8784
BMatsui@mofo.com

REBECCA WEIRES SETRAKIAN
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

*Counsel for Palo Alto Networks, Inc.*

OCTOBER 23, 2025

## Claim 1 of U.S. Patent No. 8,225,408

**1.** A computer processor-based multi-lingual method for scanning incoming program code, comprising:

receiving, by a computer, an incoming stream of program code;

determining, by the computer, any specific one of a plurality of programming languages in which the incoming stream is written;

instantiating, by the computer, a scanner for the specific programming language, in response to said determining, the scanner comprising parser rules and analyzer rules for the specific programming language, wherein the parser rules define certain patterns in terms of tokens, tokens being lexical constructs for the specific programming language, and wherein the analyzer rules identify certain combinations of tokens and patterns as being indicators of potential exploits, exploits being portions of program code that are malicious;

identifying, by the computer, individual tokens within the incoming stream;

dynamically building, by the computer while said receiving receives the incoming stream, a parse tree whose nodes represent tokens and patterns in accordance with the parser rules;

dynamically detecting, by the computer while said dynamically building builds the parse tree, combinations of nodes in the parse tree which are indicators of potential exploits, based on the analyzer rules; and

indicating, by the computer, the presence of potential exploits within the incoming stream, based on said dynamically detecting.

Appx102(19:45-20:7).

# Claim 14 of U.S. Patent No. 7,647,633

**14.** A computer program product, comprising a computer usable medium having a computer readable program code therein, the computer readable program code adapted to be executed for computer security, the method comprising:

> providing a system, wherein the system comprises distinct software modules, and wherein the distinct software modules comprise an information re-communicator and a mobile code executor;

> receiving, at the information re-communicator, downloadable-information including executable code; and

> causing mobile protection code to be executed by the mobile code executor at a downloadable-information destination such that one or more operations of the executable code at the destination, if attempted, will be processed by the mobile protection code.

Appx72(21:58-22:5).

# Claim 1 of U.S. Patent No. 7,418,731

**1.** A computer gateway for an intranet of computers, comprising:

> a scanner for scanning incoming files from the Internet and deriving security profiles for the incoming files, wherein each of the security profiles comprises a list of computer commands that a corresponding one of the incoming files is programmed to perform;

> a file cache for storing files that have been scanned by the scanner for future access, wherein each of the stored files is indexed by a file identifier; and

> a security profile cache for storing the security profiles derived by the scanner, wherein each of the security profiles is indexed in the security profile cache by a file identifier associated with a corresponding file stored in the file cache; and

> a security policy cache for storing security policies for intranet computers within the intranet, the security policies each including a list of restrictions for files that are transmitted to a corresponding subset of the intranet computers.

Appx47(11:36-55).

# CERTIFICATE OF INTEREST

Counsel for Palo Alto Networks, Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1.     **Represented Entities.**  Provide the full names of all entities represented by undersigned counsel in this case.

Palo Alto Networks, Inc.

2.     **Real Parties in Interest.**  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

3.     **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

4.     **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.

MORRISON & FOERSTER LLP:  Matthew Alan Chivvis, Daralyn J. Durie, Matthew Ian Kreeger, Rose S. Lee, Colette Reiner Mayer, Michael James DeStefano, John Sebastiano Douglass, Nicole Marie Smith, Rudolph Kim, Eric Wan-Jin Lin, Michael A. Jacobs, Emily Friesen Regier, Diek O. Van Nort

5.     **Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes, see separately filed notice.

6.     **Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated:  October 23, 2025

_____
/s/ Brian R. Matsui
Brian R. Matsui

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................i

CONFIDENTIAL MATERIAL OMITTED ...............................................v

TABLE OF AUTHORITIES ...................................................................vi

STATEMENT OF RELATED CASES ......................................................x

JURISDICTIONAL STATEMENT ..........................................................x

INTRODUCTION ..................................................................................1

STATEMENT OF THE ISSUES...............................................................3

STATEMENT OF THE CASE..................................................................4

    A.    Firewalls Scan Network Traffic For Malware ......................................4

    B.    PAN Provides Innovative Solutions To Detect Malware ....................5

    C.    Finjan Accuses PAN's NGFW, WildFire, And Other Products Of Infringing More Than 10 Patents ...................................................6

        1.    '408 patent.................................................................................7

            a.    The claims require a "scanner" that is both programming-language-specific and instantiated after determining the appropriate programming language ...........................................................................7

            b.    The district court granted summary judgment of non-infringement because NGFW and WildFire do not meet either "scanner" requirement ...........................10

        2.    '633 patent...............................................................................10

            a.    The district court construed the asserted claims to require a "user device" ................................................10

b. The district court granted summary judgment of non-infringement because WildFire is not a "user device" ...................................................................13

3. '731 patent...............................................................14

a. The asserted claims require a "security profile" that comprises a list of computer commands and is stored in temporary memory...........................................14

b. The district court granted summary judgment of non-infringement because Finjan failed to point to any aspect of WildFire that met both "security profile" requirements ......................................16

SUMMARY OF ARGUMENT .............................................17

STANDARD OF REVIEW ..................................................20

ARGUMENT ......................................................................21

I. BASED ON FINJAN'S EXPERT'S ADMISSIONS, THE DISTRICT COURT CORRECTLY CONCLUDED THAT FINJAN COULD NOT PROVE INFRINGEMENT OF THE '408 PATENT ..................21

A. Finjan Mapped Its Recited "Scanner" To Elements In NGFW And WildFire That Cannot Meet The Claim Requirements ...............22

B. Finjan's Arguments Try To Rewrite Its Expert Testimony And Its Claims...........................................................28

1. The district court did not misread Finjan's expert deposition and report...............................................28

a. Dr. Min's deposition testimony cannot be recast to support a "multiple scanner" theory .............................30

b. Dr. Min did not disclose a multiple-scanner theory in his expert report .........................................33

2.  The Court should reject Finjan's forfeited and unsupported claim construction arguments ....................................................35

    a.  This Court does not need to reach the merits of Finjan's implicit-claim-construction argument ..............36

    b.  Finjan does not show that the district court assumed an incorrect claim scope ..................................................37

II.  BECAUSE WILDFIRE'S SERVERS ARE NOT USER DEVICES, THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT THAT PAN DOES NOT INFRINGE THE '633 PATENT ....................................................................................42

  A.  The District Court Correctly Construed "Downloadable-Information Destination" ...................................................42

    1.  The intrinsic record requires a "downloadable-information destination" to be a "user device" ..............................42

    2.  Finjan shows no error in the district court's construction ........45

      a.  The specification undermines Finjan's interpretation ..................................................................45

      b.  The district court sufficiently explained its construction ..................................................................48

  B.  The District Court Correctly Granted Summary Judgment Because Finjan Offered No Evidence That WildFire Servers Provide User Interaction ....................................................51

III.  BASED ON FINJAN'S EXPERT'S FAILURE TO IDENTIFY A "SECURITY PROFILE" IN WILDFIRE, THE DISTRICT COURT CORRECTLY CONCLUDED PAN DOES NOT INFRINGE THE '731 PATENT ....................................................................................53

  A.  The District Court Correctly Rejected Finjan's Literal Infringement Theory Because No "Security Profile" Is Stored In A Cache ..................................................................54

1.      Finjan's expert identified different WildFire elements for each "security profile" requirement .............................................54

2.      Finjan fails to show that PAN "misled" the court or that the evidence supporting its "scan/analysis results" theory was sufficient all along ............................................................57

   a.      Finjan never presented a unified "WildFire Reports"-"scan/analysis results" theory .........................57

   b.      Finjan's evidence does not show that "scan/analysis results" meets all requirements of a "security profile" ...........................................................................59

B.      The District Court Correctly Rejected Finjan's Doctrine-Of-Equivalents Evidence, Which Does Not Fill The Gap In Its Literal Infringement Case .................................................................62

C.      The District Court Correctly Construed "File Cache" And "Security Profile Cache" To Exclude Permanent Memory ................65

   1.      The district court correctly assessed the ordinary meaning of "cache"...................................................................................65

   2.      Finjan fails to identify intrinsic record support to depart from the ordinary meaning of cache .........................................66

CONCLUSION .....................................................................................................70

**CONFIDENTIAL MATERIAL OMITTED**

In the non-confidential version of this brief, page 32 redacts confidential source code that was redacted in Finjan's opening brief, and page 23 redacts documentation describing confidential technical details of PAN's product.

# TABLE OF AUTHORITIES

**Cases**

*Acumed LLC v. Stryker Corp.*,
　483 F.3d 800 (Fed. Cir. 2007) ............................................48

*Alnylam Pharms., Inc. v. Moderna, Inc.*,
　138 F.4th 1326 (Fed. Cir. 2025) .........................................46

*Andersen Corp. v. Fiber Composites, LLC*,
　474 F.3d 1361 (Fed. Cir. 2007) ...............................43, 44, 45

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986).............................................................29

*Apple Inc. v. Andrea Elecs. Corp.*,
　949 F.3d 697 (Fed. Cir. 2020) ............................................41

*AquaTex Indus., Inc. v. Techniche Sols.*,
　479 F.3d 1320 (Fed. Cir. 2007) ..........................................62

*Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*,
　723 F.3d 1376 (Fed. Cir. 2013) ..........................................65

*Clare v. Chrysler Grp. LLC*,
　819 F.3d 1323 (Fed. Cir. 2016) ..........................................22

*Cleveland v. Pol'y Mgmt. Sys. Corp.*,
　526 U.S. 795 (1999)......................................................20, 29

*Clouthier v. Cnty. of Contra Costa*,
　591 F.3d 1232 (9th Cir. 2010) ............................................20

*Cohen v. Apple Inc.*,
　46 F.4th 1012 (9th Cir. 2022) .............................................20

*Cordis Corp. v. Bos. Sci. Corp.*,
　658 F.3d 1347 (Fed. Cir. 2011) ..........................................52

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
　672 F.3d 1270 (Fed. Cir. 2012) ....................................36, 69

*EcoFactor, Inc. v. Google LLC*,
    137 F.4th 1333 (Fed. Cir. 2025) ..........................................................49

*Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*,
    998 F.3d 917 (Fed. Cir. 2021) ........................................................69, 70

*Finesse Wireless LLC v. AT&T Mobility LLC*,
    No. 24-1039, 2025 WL 2713518 (Fed. Cir. Sept. 24, 2025).......................22, 29

*Finisar Corp. v. DirecTV Grp., Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ........................................................50

*Finjan, Inc. v. Cisco Sys., Inc.*,
    No. 17-CV-00072-BLF,
    2018 WL 3537142 (N.D. Cal. July 23, 2018) .................................12, 13, 50, 53

*Finjan, Inc., v. Proofpoint, Inc.*,
    No. 13-CV-05808-HSG,
    2015 WL 7770208 (N.D. Cal. Dec. 3, 2015).............................................13, 50

*Gemalto S.A. v. HTC Corp*,
    754 F.3d 1364 (Fed. Cir. 2014) ....................................................62, 63

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
    558 F.3d 1368 (Fed. Cir. 2009) .................................................42, 45, 70

*Johns Hopkins Univ. v. Datascope Corp.*,
    543 F.3d 1342 (Fed. Cir. 2008) ........................................................29

*Mangosoft, Inc. v. Oracle Corp.*,
    525 F.3d 1327 (Fed. Cir. 2008) ....................................................48, 49

*Mformation Techs., Inc. v. Rsch. In Motion Ltd.*,
    764 F.3d 1392 (Fed. Cir. 2014) ........................................................39

*Miller v. DePuy Synthes Sales, Inc.*,
    837 F. App'x 472 (9th Cir. 2020) .....................................................22

*Nevro Corp. v. Bos. Sci. Corp.*,
    955 F.3d 35 (Fed. Cir. 2020) ..........................................................69

*NexStep, Inc. v. Comcast Cable Commc'ns, LLC*,
    119 F.4th 1355 (Fed. Cir. 2024) ........................................................36

*In re Nuvasive, Inc.*,
    842 F.3d 1376 (Fed. Cir. 2016) ........................................................49

*ParkerVision, Inc. v. Qualcomm Inc.*,
    116 F.4th 1345 (Fed. Cir. 2024) .................................................49, 50

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .................................................42, 45

*Power Analytics Corp. v. Operation Tech., Inc.*,
    820 F. App'x 1005 (Fed. Cir. 2020) ..................................................59

*Sinorgchem Co., Shandong v. ITC*,
    511 F.3d 1132 (Fed. Cir. 2007) ........................................................46

*Sound View Innovations, LLC v. Hulu, LLC*,
    33 F.4th 1326 (Fed. Cir. 2022) ........................................................70

*Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*,
    806 F.3d 1356 (Fed. Cir. 2015) ........................................................68

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
    987 F.3d 1358 (Fed. Cir. 2021) ........................................................20

*TechSearch, L.L.C. v. Intel Corp.*,
    286 F.3d 1360 (Fed. Cir. 2002) .............................................20, 52, 62

*Trs. of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ........................................................68

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) ........................................................50

*VLSI Tech. LLC v. Intel Corp.*,
    87 F.4th 1332 (Fed. Cir. 2023) ........................................................63

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997) ........................................................................62

*Wi-LAN USA, Inc. v. Apple Inc.*,
  830 F.3d 1374 (Fed. Cir. 2016) ............................................................40, 42, 67

*Wiener v. NEC Elecs., Inc.*,
  102 F.3d 534 (Fed. Cir. 1996) ...........................................................................64

**Rules**

Fed. Cir. R. 47.4(a) .................................................................................................x

Fed. R. Civ. P. 50 .................................................................................................29

Fed. R. Civ. P. 52 .................................................................................................49

Fed. R. Civ. P. 56 .................................................................................................29

## STATEMENT OF RELATED CASES

There is one case related to this action brought by Finjan LLC (Finjan) against Palo Alto Networks, Inc. (PAN) asserting, among others, U.S. Patent Nos. 8,225,408, 7,647,633, and 7,418,731. Fed. Cir. R. 47.4(a). In *Finjan, LLC. v. Fortinet Inc.*, Finjan asserts overlapping claims of the '408, '633, and '731 patents. Status Rpt., No. 3:18-cv-06555-JD (N.D. Cal. Apr. 12, 2024), Dkt.53. The *Fortinet* case is stayed. Minute Entry, No. 3:18-cv-06555-JD (N.D. Cal. Feb. 21, 2019), Dkt.38.

## JURISDICTIONAL STATEMENT

The district court entered final judgment on May 19, 2025. Appx30-36. Finjan filed an amended notice of appeal on May 21, 2025. Appx11782-84.

**INTRODUCTION**

In granting summary judgment of non-infringement, the district court correctly rejected Finjan's repeated attempts to evade the record Finjan made. The court held Finjan to its experts' deposition concessions, the omissions in its experts' reports, and the claim constructions Finjan proposed or chose not to. This Court should too. Finjan should not be permitted to present different arguments on a made-up record in an attempt to evade the arguments and record that led to the adverse results Finjan now appeals.

***'408 patent:*** Finjan tries to flee from its own expert's deposition admissions and report. Finjan's asserted claims are directed to firewall technology for scanning incoming content for malicious code. At issue are two claim requirements: (1) the scanners must be for a specific programming language, and (2) each scanner must be instantiated—i.e., called up or created—"in response to" determining the specific programming language required. Finjan asserts its expert opined that PAN's products instantiate multiple programming-language-specific scanners. But the record disproves that assertion. Finjan's expert admitted that PAN's products have *one* scanner, which handles *many* programming languages, and which itself *determines* what programming language to apply.

***'633 patent:*** Finjan tries to rewrite what its patent claims. The asserted claims recite software for protecting destination devices, like personal computers, against

malicious code in downloadable content. The district court construed the term "downloadable-information destination" to be a "user device." Because Finjan wants its claims to cover non-user devices (like PAN's cloud servers), it argues that a destination and a user device are not the same. But the specification defeats that argument. The specification expressly states—with quotation marks denoting defined terms—that a downloadable-information destination is a "user device" and that a user device is a "destination."

*'731 patent:* Finjan again tries to evade what its expert said. The asserted claims require scanning incoming files at a gateway to create a "security profile," which is stored in a temporary memory for fast retrieval and is used to determine whether the files may pass through the gateway. A "security profile" must satisfy at least two requirements. It must (1) "comprise a list of computer commands" and (2) be stored in a "cache"—i.e., temporary storage. Finjan's expert pointed to reports from PAN's product it called "WildFire Reports" (among other names) as satisfying the required list of computer commands. But to show PAN's products meet the temporary-storage requirement, he pointed to something else: scan/analysis results. Because nothing in PAN's product meets both "security profile" requirements, the district court correctly concluded that PAN does not infringe.

Now, Finjan says its expert never said the "WildFire Reports" were the security profile; PAN just made that up. But the record refutes that argument. Finjan relied on the WildFire Reports as being the "security profile," but never showed they are stored in a cache. And even if Finjan's expert had pointed to the scan/analysis results, Finjan's argument still fails because those scan/analysis results do not "comprise a list of computer commands."

The district court's judgment should be affirmed.

## STATEMENT OF THE ISSUES

'408 patent:

1.      Whether the district court correctly granted summary judgment of non-infringement because Finjan's expert admitted the accused products cannot meet the claim requirements.

2.      Whether the Court should reject Finjan's forfeited, harmless, and incorrect proposed construction of the term "instantiating."

'633 patent:

3.      (a) Whether the district court correctly construed the claim term "downloadable-information destination" to match the specification's express requirements, and (b) whether the district court's explanation was adequate.

4.     Whether the district court correctly granted summary judgment of non-infringement because Finjan's expert failed to provide an opinion under the court's construction.

'731 patent:

5.     Whether the district court correctly granted summary judgment of no literal infringement because Finjan's expert failed to opine that the accused "security profile" meets the claim requirements.

6.     Whether the district court correctly rejected Finjan's underdeveloped doctrine-of-equivalents theory.

7.     Whether the district court correctly construed "cache" to have its ordinary meaning of temporary memory.

## STATEMENT OF THE CASE

### A.     Firewalls Scan Network Traffic For Malware

Malicious software—or "malware"—can be transmitted over the Internet, putting organizations and individuals at risk.  Appx7581-82, Appx7585; Appx7578-88.  Firewalls protect against malware by inspecting and filtering Internet traffic.  Appx7585-86; Appx7591, Appx7589-601.  They often operate at a router or "gateway" where Internet traffic enters non-public corporate or home networks before being transmitted to user devices like personal computers and mobile phones.  Appx7591; Appx7585-86.

Techniques for detecting malware continually evolve to meet new threats. Appx7591-92. One of the earliest techniques is "scanning," which can be performed in different ways. Appx7592. "Static" and "signature" scanning involve comparing incoming files to known malware, looking for indicators that a file is malicious. Appx7592-93; Appx7586-87. "Dynamic" scanning involves running an incoming program in a safe, simulated environment to observe whether it exhibits suspicious behaviors. Appx7593; Appx7587.

## B. PAN Provides Innovative Solutions To Detect Malware

Palo Alto Networks is a leading cybersecurity provider recognized for advancing firewall technology. At issue are two of PAN's products: Next Generation Firewall (NGFW) and WildFire. NGFW operates at the gateway of an enterprise intranet to, among other things, parse incoming network traffic and identify or block malicious content. Appx8666(¶36); Appx8666-8670; Appx8664-731. Unlike traditional firewalls, NGFW analyzes a stream of incoming packets as they are transferred, using machine learning, centralized policy control, and user identity awareness to enhance threat detection. Appx8666-68(¶¶37, 40); Appx8719(¶511); Appx8272-73(¶¶30-31); Appx8271-75. NGFW's "App-ID" tries to determine whether an incoming packet is part of a known safe or malicious application. Appx8667-69(¶¶40-41). If needed, NGFW inspects the content in

greater detail, which involves its Content Threat Detection (CTD) Engine. Appx8667-69(¶¶40-41); Appx8704-05(¶487).

PAN's WildFire can be used with NGFW. Appx8672-73(¶¶48-50). When NGFW analyzes packets of Internet traffic entering through a gateway, it can send unknown files to WildFire, which then analyzes those files in a cloud-based virtual environment. Appx8666-67(¶¶36-37), Appx8672(¶49). WildFire performs static and dynamic scanning. Appx8672(¶49); Appx7592-93; Appx7586-87. Static scanning generates "signatures" that help NGFW and other PAN products identify similar malware in the future, and dynamic scanning generates reports logging a file's suspicious behaviors. Appx8672(¶¶48-50).

## C. Finjan Accuses PAN's NGFW, WildFire, And Other Products Of Infringing More Than 10 Patents

Finjan holds patents purporting to claim priority to 2000 and earlier, directed to firewall technology of that period. Finjan asserted seven of these patents against PAN and accused five products. Appx2274-301. Over the past decade of litigation, Finjan has repeatedly attempted to expand and revise its infringement theories, trying to find a viable one. Appx5125-30; Appx130 (Dkt.177); Appx7615-17.

Over time, Finjan's case narrowed to three patents against two of PAN's products: NGFW and WildFire.

| Patent | Claims | Accused Products |
|--------|--------|------------------|
| '408 | 1, 4-6, 22 | NGFW, WildFire |
| '633 | 14 | WildFire |
| '731 | 1, 2, 14-15, 17 | WildFire |

Appx8577. The district court granted summary judgment that PAN does not infringe those remaining patents. Appx16-28; Appx29; Appx8567-95; Appx11614-34.

### 1. '408 patent

#### a. The claims require a "scanner" that is both programming-language-specific and instantiated after determining the appropriate programming language

The '408 patent is directed to scanning incoming program code using programming-language-specific rules. Appx83 (Abstract); Appx83-106. The claimed process involves scanners each created to scan a specific programming language (e.g., "ARB SCANNER HTML," "ARB SCANNER JAVASCRIPT," "ARB SCANNER URI"):



FIG. 7

Appx92(Fig.7), Appx100(15:36-41). The specification explains that "[a]n advantage of the present invention is the ability to generate such a multitude of content scanners within a unified framework" (Appx100(15:41-43)) that can be produced "on demand" (Appx100(15:14-15, 15:56-58)).

Claim 1 recites this method:

> 1. A computer processor-based multi-lingual method for scanning incoming program code, comprising:

> receiving, by a computer, an incoming stream of program code;
>
> *determining, by the computer, any specific one of a plurality of programming languages in which the incoming stream is written;*
>
> *instantiating, by the computer, a scanner for the specific programming language, in response to said determining*, the scanner comprising parser rules and analyzer rules for the specific programming language, wherein the parser rules define certain patterns in terms of tokens, tokens being lexical constructs for the specific programming language, and wherein the analyzer rules identify certain combinations of tokens and patterns as being indicators of potential exploits, exploits being portions of program code that are malicious;
>
> … .

Appx102(19:45-20:7). Claim 1 sets forth two requirements relevant here for the "scanner." First, it must be "for the specific programming language" of the input code. Appx20-21; Appx102(19:52-53). Second, it must be instantiated "in response to" determining the input code's programming language. As the district court explained, "instantiating" has an ordinary meaning that

> can be understood as calling up, creating, or bringing about an instance of something—such as calling up a scanner to be used for the next step of the method.

Appx20-21 n.2. The claims thus require determining the programming language of the input and then instantiating a scanner for that specific programming language. Appx22; Appx102(19:49-55); *see* Appx100(15:14-15, 15:56-58).

### b. The district court granted summary judgment of non-infringement because NGFW and WildFire do not meet either "scanner" requirement

Finjan accused PAN's NGFW and WildFire of infringing claims 1, 4-6, and 22 of the '408 patent. Appx8577; *supra* p.7. The district court granted summary judgment of non-infringement because the accused products could not meet either "scanner" requirement. Appx20-23, Appx28. For each accused product, Finjan's expert Dr. Min admitted that the "scanner" he identified handles multiple programming languages (rather than being "for [a] specific programming language"). Appx20-22. Dr. Min also admitted that the "scanner" in each product performs the "determining" step (rather than being instantiated "in response to" the determining). Appx21-23.

### 2. '633 patent

### a. The district court construed the asserted claims to require a "user device"

The '633 patent is directed to protecting personal computers from malicious downloadable content. Appx49(Abstract); Appx49-82. Protection comes from packaging the downloadable content together with computer code for monitoring and intercepting malicious code. Appx49(Abstract).

In the terminology of the '633 patent: A "downloadable" (or "mobile code") received over a network can carry out malicious operations. Appx49(Abstract). To protect user devices, the downloadable is first received by a server, such as corporate

server (140b) shown in Figure 1c below. Appx52(Figs.1b-1c), Appx62(2:39-44), Appx65(7:1-35). The server then sends the "downloadable" (D) along with "mobile protection code" (MPC) to destination user devices (145) "for execution by [those] client devices." Appx52(Figs.1b-1c), Appx62-63(2:66-3:11), Appx65(7:1-35). The mobile protection code installs itself at the destination user device, then initiates the downloadable, and intercepts any malicious activity. Appx71(19:65-20:9), Appx60(Fig.11).



**FIG. 1c**

Appx52(Fig.1c).

    Claim 14 recites a product that carries out this method:

> 14. A computer program product, comprising a computer usable medium having a computer readable program code therein, the computer readable program code adapted to be executed for computer security, the method comprising:

> providing a system, wherein the system comprises distinct software modules, and wherein the distinct software modules comprise an information re-communicator and a mobile code executor;
>
> receiving, at the information re-communicator, downloadable-information including executable code; and
>
> causing mobile protection code to be executed by the mobile code executor at a *downloadable-information destination* such that one or more operations of the executable code at the destination, if attempted, will be processed by the mobile protection code.

Appx72(21:58-22:5).

Based on the intrinsic record, the district court construed "downloadable-information destination" as a

> user device that includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution.

Appx10-11; Appx1-15. The parties agreed on the second part of that construction, which the specification states:

> A suitable information-destination or "user device" can further include *one or more devices or processes* (such as email, browser or other clients) *that are capable of receiving and initiating or otherwise hosting a mobile code execution*.

Appx65(7:58-62) (emphasis added); *see* Appx72(22:1-3). The court adopted the requirement, matching earlier constructions of the same term in the same district.

Appx10 (discussing *Finjan, Inc. v. Cisco Sys., Inc.*, No. 17-CV-00072-BLF, 2018

WL 3537142, at *20 (N.D. Cal. July 23, 2018), and *Finjan, Inc., v. Proofpoint, Inc.*, No. 13-CV-05808-HSG, 2015 WL 7770208, at *5 (N.D. Cal. Dec. 3, 2015)).

PAN proposed the "user device" part of the construction. As PAN and the *Cisco* court both noted, additional parts of the specification also support that construction. Appx5955; Appx5944-69; *Cisco*, 2018 WL 3537142, at *20 & n.8. In particular, the specification further defines downloadable-information destination when it states "one or more user devices or 'Downloadable-destinations.'" Appx65(7:5); *see* Appx10-11.

### b. The district court granted summary judgment of non-infringement because WildFire is not a "user device"

Finjan mapped the "downloadable-information destination" requirement to WildFire servers, including cloud-based servers, that run backend virtual machines. Appx24. But Finjan's expert Dr. Keromytis never said—let alone explained how—WildFire servers are user devices. Appx24. Instead, lifting from Finjan's infringement contentions, he opined only that the servers might be a user device or some other type of device: "WildFire … is *a device*—a user device *or otherwise* … ." Appx24 (emphasis added; citing Appx8924-25(¶381)); Appx8880-984. The court noted that Dr. Keromytis interpreted "user device" to mean "*any* receiving device or process," reading "user" out of the court's construction. Appx24 (court's emphasis); Appx10587(138:9-15); Appx10585-89; *accord* Appx8924-25(¶381 n.87).

### 3.    '731 patent

#### a.    The asserted claims require a "security profile" that comprises a list of computer commands and is stored in temporary memory

The '731 patent relates to scanning incoming files at a gateway, using caching to reduce latency.    Appx37(Abstract),    Appx42(1:64-67),    Appx46(10:9-12); Appx37-48.

The patent discloses scanning an incoming file to derive a "security profile." Appx42(2:3-6).  A "security profile" is a list of computer commands that the scanned file is programmed to perform.    Appx42(2:3-6), Appx44(Tbl.1).    Based on that profile, the gateway determines whether to restrict transmission of the file to a connected computer.  Appx42(2:12-34).

The file and its security profile are stored in "cache" memory for fast retrieval. The cache is local within the gateway computer, so content (such as a web page) can be loaded quickly from the cache rather than being retrieved from another location. Appx42(1:64-67), Appx46(10:9-12) ("caching of web objects within the gateway computer's web cache eliminates significant network latency for client computers"). The specification describes the importance of keeping the caches current. Appx45(8:11-47).  Old files get replaced with new ones or purged periodically, and files' security profiles get updated.  Appx45(8:23-49).

Claim 1 covers a gateway with caches:

1. A computer gateway for an intranet of computers, comprising:

> a scanner for scanning incoming files from the Internet and deriving security profiles for the incoming files, *wherein each of the security profiles comprises a list of computer commands* that a corresponding one of the incoming files is programmed to perform;

> a file cache for storing files that have been scanned by the scanner for future access, wherein each of the stored files is indexed by a file identifier; and

> *a security profile cache for storing the security profiles derived by the scanner*, wherein each of the security profiles is indexed in the security profile cache by a file identifier associated with a corresponding file stored in the file cache; and

> a security policy cache for storing security policies … .

Appx47(11:36-55).

The district court construed "cache" as temporary memory. Appx5-7. It explained that "file cache" means "a memory for temporarily holding a file" and indicated that its construction imposed no specific requirement on how long (or short) a file must be stored. Appx6-7. The court rejected Finjan's position that "file cache" means memory that holds a file "at least temporarily," which would encompass storage in memory "forever." Appx5-6.

The district court later explained that its "file cache" construction applied to the "security profile cache" too. So the term "security profile cache" means "a memory for temporarily holding a security profile." Appx26 n.3. The asserted

claims thus require (1) a "security profile" that "comprises a list of computer commands" and (2) temporary memory to store that "security profile." Appx25-26.

> **b.** **The district court granted summary judgment of non-infringement because Finjan failed to point to any aspect of WildFire that met both "security profile" requirements**

Finjan accused WildFire of infringing the '731 patent. Appx8577. The district court granted summary judgment of non-infringement because Finjan failed to show a material dispute of fact as to the "security profile" and "security profile cache" requirements. Appx25-28. Finjan's expert said that reports called WildFire Reports met the "security profile" requirement because they contain a behavior summary, which he said is a "list of computer commands." Appx9034-35(¶658). He also identified WildFire's Local DB as temporary memory for the "security profile cache." Appx9069-70(¶812). But he never opined that WildFire Reports— or any reports—are saved in Local DB. *See* Appx9082-85(¶¶825-26, 828). Instead, he focused on something different: "scan results"/"analysis results," which he said are saved in Local DB. Appx9082-85(¶¶825-26, 828).

Because Finjan never tried to show that WildFire Reports are saved in a cache, the district court deemed Finjan to have "effectively abandon[ed]" that argument. Appx26; Appx10384-414. And because Finjan never even attempted to show that the "scan results"/"analysis results" "comprise[] a list of computer commands," the

court concluded that Finjan created no dispute of fact on that argument too. Appx27; Appx10407-08.

The district court also held that Finjan's doctrine-of-equivalents argument failed. As PAN showed, Finjan's expert never addressed the difference between the required temporary cache memory and WildFire's persistent database storage. Appx8592-93; Appx8699-702(¶¶438-42); Appx27 n.4. The court agreed: "Finjan's cursory suggestion that there may be infringement under the doctrine of equivalents is too underdeveloped to give rise to a triable issue of fact." Appx27 n.4.

## SUMMARY OF ARGUMENT

I.     The district court correctly concluded that neither PAN's NGFW nor WildFire infringe the asserted claims of the '408 patent. Finjan's expert admitted that both NGFW and WildFire lack multiple required elements of the "scanner." Finjan tries to escape its expert's deposition admissions by insisting that he would have presented a different infringement theory had PAN's questions been asked a different way. But Finjan's expert made no fleeting statement: he identified the accused scanner for both NGFW and WildFire from figures in his own expert report, and he doubled down on his answers when PAN's counsel repeated the questions.

Finjan also contends that the district court implicitly construed "instantiating" when it granted summary judgment. But Finjan again cannot escape its own prior statements. Finjan did not request a construction of the term, and its counsel even

described "instantiating" as the court did when it granted summary judgment. Even now, Finjan does not say what construction it wants, and it identifies no intrinsic evidence conflicting with how the district court applied the claims.

II.     The district court correctly granted summary judgment that WildFire does not infringe following its construction of the '633 patent.

The district court's construction that a "downloadable-information destination" is a user device matches the specification's express requirements, as well as the patent's stated purpose and examples. Finjan fails to confront key passages of the specification, which set off the defined term in quotation marks and expressly equate a destination with a "user device" and a user device with a "destination." Instead, Finjan primarily challenges how much—or how little—the district court said when construing the claims. But the district court provided ample explanation, and this Court reviews its judgment, not its opinion.

Nor did the district court err in granting summary judgment. Finjan's expert offered no infringement opinion under the district court's claim construction. He instead reinterpreted the construction so a user device does not need to be for users at all.

III.     For the '731 patent, Finjan's expert failed to identify anything in WildFire that could meet both requirements of the claimed "security profile": that it (1) "comprise[] a list of computer commands" and (2) be stored in a "security

profile cache." Finjan's expert offered an inconsistent claim mapping. He opined that the "WildFire Reports" comprised a list of one or more computer commands, but he then opined that something else—the "scan/analysis results"—was stored in the security profile cache. The district court recognized this inconsistency and granted summary judgment of non-infringement.

On appeal, Finjan tries to blame PAN for Finjan's own evidentiary deficiencies. Finjan contends that its expert had no "WildFire Reports" theory and that PAN—not Finjan—made that theory up. But the "WildFire Reports" theory was no figment of PAN's imagination; Finjan's expert's report expressly identified "WildFire Reports" and trivial variations of that phrase. Each time it pointed to the same report. Regardless, subtracting the WildFire Reports gets Finjan nowhere; Finjan's infringement theory is just as deficient without them. It still has no evidence that its other theory—"scan/analysis results"—can meet both "security profile" requirements.

Finjan's remaining arguments likewise fail. Its expert testimony on doctrine of equivalents never addressed the gap in its literal infringement testimony. Just as Finjan showed no "cache" on literal infringement, it showed no equivalents of a "cache." Failing there, Finjan tries to eliminate the "cache" requirement altogether. Even though the ordinary meaning of "cache" means temporary storage, Finjan

argues that its claims encompasses storage of indefinite duration. But nothing in the patent supports such a redefinition.

## STANDARD OF REVIEW

This Court "review[s] the grant of summary judgment under the law of the regional circuit in which the district court sits." *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1365 (Fed. Cir. 2021). The Ninth Circuit "review[s] a district court's grant of summary judgment de novo." *Cohen v. Apple Inc.*, 46 F.4th 1012, 1025 (9th Cir. 2022). A party cannot defeat summary judgment with an expert's "conclusory assertions." *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1252 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371-72 (Fed. Cir. 2002). Nor can a party "create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).

This Court "review[s] a district court's claim constructions … de novo, but … review[s] subsidiary factual findings based on extrinsic evidence for clear error." *Synchronoss*, 987 F.3d at 1365.

# ARGUMENT

## I. BASED ON FINJAN'S EXPERT'S ADMISSIONS, THE DISTRICT COURT CORRECTLY CONCLUDED THAT FINJAN COULD NOT PROVE INFRINGEMENT OF THE '408 PATENT

The asserted claims require a "scanner" that meets two requirements relevant here: first, it must be a scanner "for the specific programming language" rather than a multi-language scanner. Appx20-21; Appx102(19:52-53), Appx103(21:48-49). Second, it must be instantiated "in response to said determining" of the appropriate programming language. Appx22; Appx102(19:49-53), Appx103(21:46-49). As the district court explained, "instantiating" "can be understood as calling up, creating, or bringing about an instance of something—such as calling up a scanner to be used for the next step of the method." Appx20-21 n.2. So for a scanner to be instantiated "in response to said determining," it must be called up or created *after* the determining of the appropriate programming language happens. Appx102(19:52-53), Appx103(21:48-49).

The district court correctly concluded Finjan could not meet either scanner requirement. Finjan's expert Dr. Min admitted that he identified only one scanner for the scanner requirements. But that scanner is not "for the specific programming language," nor is it instantiated "in response to" determining that specific programming language. Appx20-22. This Court should reject Finjan's attempts to rewrite both its expert's testimony and the plain meaning of the claims.

## A. Finjan Mapped Its Recited "Scanner" To Elements In NGFW And WildFire That Cannot Meet The Claim Requirements

*NGFW:* An expert's admission can defeat a plaintiff's claims. *See, e.g.,* *Clare v. Chrysler Grp. LLC*, 819 F.3d 1323, 1332-34 (Fed. Cir. 2016) (affirming summary judgment of non-infringement based on expert admissions showing accused product failed to meet a claim requirement); *Miller v. DePuy Synthes Sales, Inc.*, 837 F. App'x 472, 474-75 (9th Cir. 2020) (affirming summary judgment based on expert's admissions about the scope of his testimony); *cf. Finesse Wireless LLC v. AT&T Mobility LLC*, No. 24-1039, 2025 WL 2713518, at *2-4 (Fed. Cir. Sept. 24, 2025) (precedential) (district court should have granted JMOL based on expert's admission that his mapping precluded infringement). Here, the district court correctly concluded, based on Dr. Min's admissions, that the accused "scanner" in NGFW cannot meet the "scanner" claim requirements. Appx20-22.

Both experts confirmed that NGFW lacks a programming-language-specific scanner required by the claims and instead uses a single multi-language scanner. PAN's expert Dr. Rubin stated that NGFW includes "a single general scanner irrespective of what it analyzes." Appx8716-17(¶505), Appx8705-06(¶488). Similarly, Dr. Min's expert report contains a section with the heading "Scanner" that never mentions any programming-language-specific scanners that get instantiated. Appx10450-62(¶¶354-71); Appx10418-503. Instead, he identified only "a" multi-language scanner in his report. Appx10450(¶355); *see infra* pp.33-35.

22

Dr. Min confirmed this evidentiary failure in his deposition. Appx8752-844; Appx10504-18. After being presented a figure from his report, Dr. Min was asked what purportedly met the "scanner" requirement. Appx10507(489:10-13), Appx10509(492:17-19), Appx10511(494:16-19). In response, Dr. Min identified only a scanner that handles multiple programming languages. Appx8818(509:4-7), Appx8820(511:8-15); Appx21. To identify the scanner, Dr. Min drew a red box around the "CTD Engine" and added the words "+ App-ID." Appx8846. He wrote on the figure that the CTD Engine and App-ID are "the claimed 'scanner' for NGFW."



Appx8845-46; *see supra* pp.5-6 (explaining the role of App-ID and CTD Engine in NGFW's analysis). And Dr. Min confirmed that this single "scanner" (CTD Engine + App-ID) was the claimed scanner his opinions relied upon:

> Q. … And it's your opinion that the entirety of the CTD engine plus APP-ID is the claimed scanner for NF -- NGFW, correct?
>
> A. Yes.

Appx8814-15(505:23-506:1); Appx21.

Dr. Min also confirmed that this scanner is not a programming-language-specific scanner:

> Q. Okay. Can the NGFW scanner that you've identified handle multiple different programming languages?
>
> A. Yes.

Appx8818(509:4-7), Appx8820(511:8-15); Appx21. Because Dr. Min (and Dr. Rubin) pointed to a "scanner" that works regardless of the programming language, no dispute of fact precluded summary judgment. Finjan failed to show NGFW includes a "scanner … for the specific programming language." Appx21.

The district court also correctly granted summary judgment for a second reason: Finjan failed to show that NGFW instantiates a "scanner" "in response to said determining." Appx22; Appx102(19:52-53); *see* Appx8714-18(¶¶502, 508) (PAN's expert opining that NGFW does not meet the "determining" and "instantiating" requirements). Simply put, "determining" must occur before

24

"instantiating." Yet the NGFW scanner Finjan identified has already been instantiated when the determining steps occurs.[1]

Once again, Finjan could not evade the admissions of its expert. During Dr. Min's deposition, PAN's counsel asked about the "determining" step. In the figure reproduced above, Dr. Min circled in blue all components that he said "determin[e]" the programming language. Appx8816(507:7-16). He circled "App-ID" and two elements of the "CTD Engine." Appx8846; *supra* p.23. These elements are part of the "scanner" he identified. Appx8846; Appx8814-15(505:23-506:6), Appx8816(507:7-16). That too precludes infringement: because the "scanner" he identified already would have been created or called up to perform the "determining," that scanner could not be instantiated (i.e., created or called up) "in response to said determining." Appx22; Appx102(19:53).

*WildFire:* The district court correctly ruled, based on similar expert admissions, that WildFire cannot meet the "scanner" claim requirements. Appx22-23.

---

[1] Finjan's reliance on CTD Engine fails for another reason. Finjan failed to disclose the CTD Engine in its infringement contentions, so the district court ruled that Dr. Min's "opinions that rely on a 'CTD engine' in NGFW … will be excluded." Appx7615-17. Were this Court to remand, the district court would need to address Finjan's reliance on such excluded testimony.

As with NGFW, Dr. Min's report identified only a multiple-language scanner. Appx10489-95(¶¶412-22). PAN's counsel asked Dr. Min in his deposition to confirm what in WildFire purportedly met the "scanner" requirements. Dr. Min identified only one WildFire scanner. But that scanner does not practice the claims. It is not for a "specific programming language," nor is it instantiated "in response to" determining that specific programming language. Appx22-23.

Specifically, Dr. Min again marked a figure from his report identifying the "scanner" in WildFire. Dr. Min circled in red what he mapped to the recited "scanner": WildFire's "static analysis" and "dynamic analysis."



Appx8847-48; *see supra* p.6 (explaining WildFire's static and dynamic analyses).

As the district court recognized, Dr. Min confirmed that the static and dynamic

analysis together were the scanner that he relied on for his opinions:

> Q. And is it your opinion that the components of the WildFire scanner are the static analysis via machine learning and the dynamic analysis, including the VMs that you have circled in red … on Exhibit 43?
>
> A. Yes.

Appx8825(519:18-24); Appx22.

Based on the only scanner Dr. Min identified, the district court correctly

concluded that Finjan never identified a "scanner for the specific programming

language." Appx22; Appx102(19:52-53). Dr. Min stated the only scanner he relied

on is not programming-language specific:

> Q. … And so the -- the WildFire scanner you've identified can accommodate multiple different programming languages, true?
>
> A. Yes.

Appx8830-31(524:23-525:1); Appx22-23. Dr. Rubin also agreed that Dr. Min

identified only a "general scanner" for multiple programming languages.

Appx8722-23(¶¶517-18); *see* Appx8709-13(¶¶493, 497-98); Appx10546(¶522)

(explaining ways WildFire operates without regard to programming language);

Appx10519-50.

In addition, the district court correctly recognized that the "scanner" Dr. Min identified itself performs the "determining," which meant this "scanner" could not be instantiated "in response to said determining." Appx23; Appx102(19:52-53); *see* Appx8722-23(¶517) (PAN's expert opining that WildFire does not meet the "instantiating" limitation). When asked what in WildFire purportedly performs the "determining" step, Dr. Min circled in blue the same "static analysis" and "dynamic analysis" that make up the accused "scanner." Appx8848; Appx8828-29(522:17-523:3). Because the scanner must already have been created or called up before "said determining," the scanner Dr. Min identified could not have been instantiated "in response to said determining."

## B. Finjan's Arguments Try To Rewrite Its Expert Testimony And Its Claims

### 1. The district court did not misread Finjan's expert deposition and report

Finjan tries to escape its own expert's testimony by arguing that, all along, Dr. Min had mapped the recited "scanner" to something else. Finjan Br. 22-28. Finjan contends both that Dr. Min's report set forth a "multiple scanner" theory—that NGFW and WildFire instantiate multiple scanners, one scanner for each programming language—and that Dr. Min stuck to that theory in his deposition. Finjan Br. 24-28.

For Finjan to prevail, both must be true. Finjan's multiple-scanner theory must have been presented in Dr. Min's report, and his deposition testimony must have been consistent with that report. As courts have explained, a party's own contradictory testimony fails to provides evidence from which a reasonable jury could find for that party. The Supreme Court has held that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement." *Cleveland*, 526 U.S. at 806. And in holding that a district court should have granted JMOL of non-infringement, this Court has explained that "[w]hen the party with the burden of proof … rests its case on an expert's self-contradictory testimony, we may conclude the evidence is insufficient to satisfy that standard." *Finesse*, 2025 WL 2713518, at *4; *Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1349 (Fed. Cir. 2008) (same).[2] Under this precedent, if Dr. Min articulated a multiple-scanner theory in one place but repudiated it in the other, his self-contradicted statements could not defeat summary judgment of non-infringement.

Regardless, Dr. Min articulated a multiple-scanner theory in neither his deposition nor his report. Dr. Min's deposition testimony dooms Finjan's implausible reading because he unequivocally testified he was relying only on a

---

[2] Rule 56's genuine-dispute inquiry "is the same" as Rule 50's reasonable-jury inquiry. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986).

single, multi-language scanner. His report never mapped the recited "scanner" to any language-specific scanners.

### a. Dr. Min's deposition testimony cannot be recast to support a "multiple scanner" theory

Finjan fails to show that Dr. Min's deposition testimony reflects anything but his fatally-flawed, single-scanner mapping. Finjan contends that, in context, Dr. Min meant that the sole "scanner" he identified was actually many different language-specific scanners. Those scanners are supposedly contained within the NGFW elements he circled. Finjan Br. 26-28.

The deposition transcript debunks that argument. Dr. Min was unequivocal: he mapped the recited "scanner" to the NGFW and WildFire elements he circled, and only to those elements. He stated that the circled elements *are* "the claimed scanner" for NGFW, not elements that *contain* any accused scanners. Appx8814-15(505:23-506:1); Appx10509-10(492:17-493:20); Appx8807-08(494:16-495:16); Appx8846 (annotating figure with "= the claimed 'scanner' for NGFW"). And he conceded that no other scanner or scanners supports his infringement contentions:

> Q. Did you rely on any scanner other than the scanner you identified in Exhibit 38 to support your infringement contentions for NGFW?
>
> A. No.

Appx8817-18(508:25-509:3).

For WildFire, Dr. Min confirmed the same. He stated the components he identified in WildFire *are* the scanner he had identified; he never stated that they just *contain* an accused scanner. Appx8825(519:14-17). And Dr. Min testified that he was not mapping anything else (such as the supposed multiple scanner subcomponents Finjan now points to) to the recited "scanner":

> Q. So you've identified in Exhibit 43 the only scanner that you rely on in forming opinions about WildFire?
>
> A. Yes.

Appx8829-30(523:21-524:12); *see* Appx8817-18(508:25-509:3), Appx8823(517:14-17), Appx8825(519:14-17).

Finjan also wrongly contends that the district court took Dr. Min's testimony out of context. Finjan argues Dr. Min was "forced" to annotate "high-level diagrams" that were purportedly missing multiple scanners. Finjan Br. 26-27. But these figures came from Dr. Min's own report, and he never said or suggested any scanners were missing from them. To the contrary, Dr. Min confirmed the scanners he relied on for both NGFW and WildFire were depicted in both figures. *Supra* pp.23-24, 26-27; Appx8823(517:14-17), Appx8825(519:14-17). Indeed, for NGFW, Dr. Min confirmed he saw "part" of the scanner (CTD Engine) and was able to add the rest of the scanner by writing "+ App-ID." Appx10509(492:4-9); Appx8806-08(493:21-495:2); Appx8846. That Dr. Min added something more to

the figure shows that he could have added whatever additional elements he wanted if his theory actually involved "multiple scanners."

Finjan points to a single mention Dr. Min made to "multiple different scanners" for WildFire in his deposition. To start, this argument has no bearing on NGFW; it goes only to WildFire. And it fails there. Dr. Min stated that "multiple different scanners are instantiated at a different time" in WildFire. Finjan Br. 27-28 (quoting Appx8829(523:6-18)). But Dr. Min was not mapping those supposed scanners to the claims. To the contrary, PAN followed up immediately after this statement to determine whether Dr. Min was backtracking from his earlier admissions. He was not. Dr. Min instead twice confirmed that he had "identified in Exhibit 43 *the only scanner* that [he] rel[ied] on." Appx8830(523:21-12) (emphasis added). And he confirmed that scanner handles multiple different programming languages. Appx8820-31(524:23-525:1).

Unable to identify more than one accused scanner, Finjan's reliance on supposedly language-specific functions within the sole scanner Dr. Min identified cannot help it. Finjan Br. 24-25 ("source code" "source code" "source code" "source code"). These language-specific functions prove PAN's point. Finjan accused only a scanner that includes these capabilities for multiple programming languages, not one "for the specific programming language." Appx22. And these functions cannot overcome the other shortcoming of the accused

"scanner": the scanner itself performs the determining. This means it must have already been instantiated before the determining, not "in response to said determining." Appx22.

> ### b. Dr. Min did not disclose a multiple-scanner theory in his expert report

Finjan also argues that Dr. Min's expert report contained a "multiple scanner" infringement theory. Finjan Br. 24-26. But Dr. Min's expert report included no such "multiple scanner" theory for either NGFW or WildFire.

*NGFW:* As noted above, Dr. Min's expert report had an entire section dedicated to the scanner requirement. Appx10450-62. In that 12-page section, Dr. Min nowhere disclosed a multiple-scanner theory and identified the same single, multi-language scanner he did in his deposition. The report repeatedly referred to "*a* scanner" and the "'Application Engine (App-ID)' and the 'Threat Engine (CTD)' (aka Content-ID/Threat Prevention)" that Dr. Min circled in his deposition. Appx10450(¶355), Appx10449-62(¶¶353-71). And the "scanner" section confirms that the NGFW scanner is "a" multi-language "scanner": "The incoming stream of content is in multiple programming languages … and *the* scanner … uses parser rules for specific languages." Appx10451-52(¶356) (emphasis added); Appx8716-17(¶505), Appx8705-06(¶488) (PAN's expert confirming the same).

On appeal, Finjan studiously ignores the "scanner" section of Dr. Min's expert report, even though no other section purported to provide the mapping for the recited

"scanner." Aside from a bare citation to the entire "scanner" section, Finjan never attempts to show *where* that section articulates a multiple-scanner theory. Finjan Br. 24 (citing Appx10449-62(¶¶353-71)). Finjan instead focuses on other sections— primarily Dr. Min's source code analysis. Finjan Br. 24 (citing Appx10468-89(¶¶387, 389-411)). But Dr. Min stated that his source code analysis just "confirms [his] opinions" from prior sections, meaning the multi-scanner theory must be set forth elsewhere. Appx10465(¶384). It was not. So in the absence of any such theory, Dr. Min's identification of language-specific source code simply reflects the obvious fact that a multi-language scanner would have source code specific to different programming languages it handles. *See* Appx10468-69(¶387).

Finjan also cites the part of Dr. Min's report addressing a different claim requirement: "Parser Rules and Analyzer Rules." Finjan Br. 24 (citing Appx10462-65(¶¶372-83)). But again, Finjan never explains how anything there supports its phantom multi-scanner theory.

Finjan contends that PAN's expert acknowledged that Finjan had a multi-scanner infringement theory. Finjan Br. 28 (citing Appx10536(¶504)). Not so. PAN's expert simply stated that Dr. Min's parroting of the claim language and reference to multiple programming languages was too conclusory to show multiple scanners in the NGFW. Appx10536-37(¶504) ("Dr. Min only states in a conclusory fashion, without support, that there is a different 'scanner' instantiated based on

different programming languages." (citing Appx10451(¶356)); *see* Appx10450(¶354).

*Wildfire:* Dr. Min's expert report also presented no multiple-scanner theory for WildFire. The report addressed the same "static analysis" and "dynamic analysis" he identified as the multi-language scanner in his deposition. Appx10489-95(¶¶412-22). And it confirmed that Dr. Min relies on a single, multi-language "scanner": "The incoming stream of content is in multiple programming languages and *the* scanner uses parser rules for specific languages." Appx10490(¶413) (emphasis added).

Finjan again argues that the source-code section of Dr. Min's report revealed a multiple scanner theory. Finjan Br. 25-26 (citing Appx10496-513(¶¶424-27, 429-52)). But that section of the report again simply "confirm[ed] [his] opinions"; it did not set forth any different mapping for the recited "scanner." Appx10495(¶423).

## 2. The Court should reject Finjan's forfeited and unsupported claim construction arguments

With no expert support for its infringement theories, Finjan pivots to claim construction. Finjan argues that the district court implicitly misconstrued the term "instantiating." Finjan Br. 28-33. Finjan's position is not entirely clear. It offers no affirmative construction of "instantiating." At times, Finjan complains that the district court assumed a claim scope that bars the recited "scanner" from being "involved in the 'determining' limitation." Finjan Br. 30. Elsewhere, Finjan argues

the district court went further, precluding the "scanner" not just from being involved in the "determining" but also from "existing prior to the 'instantiating' limitation." Finjan Br. 29. Either way, Finjan shows no error.

> **a.** **This Court does not need to reach the merits of Finjan's implicit-claim-construction argument**

*First*, Finjan forfeited its request for claim construction on appeal. "[A] party may not, as a general rule, change the scope of its claim construction on appeal." *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc*., 672 F.3d 1270, 1273 (Fed. Cir. 2012). A party forfeits claim scope arguments by agreeing to the plain and ordinary meaning of a term before the district court, particularly when the district court later relies on the party's representations of the claim scope. *NexStep, Inc. v. Comcast Cable Commc'ns, LLC,* 119 F.4th 1355, 1365-66 (Fed. Cir. 2024); *Digital-Vending*, 672 F.3d at 1277-78.

That principle applies here: Finjan never asked the district court to construe "instantiating." Appx20-21 n.2; Appx5147-51; Appx5132-58; Appx6288-302. The district court treated the term "instantiating" just like Finjan and PAN asked it to, noting "the parties appear to agree [the term] has no special meaning in the patent, and can be understood as calling up, creating, or bringing about an instance of something." Appx20-21 n.2; *see* Appx11720-21(15:9-16:4) (Finjan's counsel stating similar, and if anything narrower, definition than what the court adopted); Appx11706-56. It is too late for Finjan to argue for something different.

**Second**, any error is harmless. *Contra* Finjan Br. 32-33. The district court's decision rested on two separate claim requirements. Appx22-23; *see* Appx8578-84 (PAN summary judgment motion raising two separate bases); Appx11620-24. Finjan's new claim construction argument goes only to the order of steps: the scanner must be instantiated "in response to" and therefore after "said determining" the appropriate programming language. Finjan Br. 30-32. Nothing in Finjan's claim scope argument affects the district court's other rationale: Finjan had no evidence showing the required scanner "for the specific programming language." Dr. Min identified only a multi-language scanner in his deposition. *Supra* pp.24, 27; Appx20-23.

### b. Finjan does not show that the district court assumed an incorrect claim scope

Regardless of how Finjan characterizes the district court's claim scope, Finjan shows no error.

To the extent Finjan complains that the district court precluded the "scanner" from existing before its instantiation, the district court imposed no such requirement. Finjan argues that the court "preclude[d] the existence of" the "scanner" before it is instantiated and required a new scanner be "created from scratch." Finjan Br. 29, 31-32. But the district court explained that "instantiating" includes "calling up, creating, or bringing about" the scanner, not just "creating." Appx20-21 n.2. And the court's ruling did not turn on whether a scanner was "created from scratch"; it

concluded that Finjan's "infringement claim fails because determining the language only happens after the scanner has been *called*." Appx23 (emphasis added). In other words, regardless of when it comes into existence, the scanner that already has been instantiated cannot perform the determining step.

Elsewhere, Finjan seems to argue that the district court should have read the claims as allowing the recited "scanner" to be involved in the "determining" step. Finjan Br. 30-31 (describing the district court's "new negative limitation" as "no 'scanner' can be involved in the 'determining' limitation (particularly not if it is also used in the 'instantiating' limitation)"). But Finjan's argument ignores how the term "instantiating" is used in the claim and that its own expert rejected Finjan's reading in no uncertain terms. Claim 1 expressly dictates an order of operation for when the scanner is instantiated. The claims require "instantiating … a scanner … in response to said determining." Appx102(19:52-53). That means that the scanner must be instantiated (created or called up) after the determining step. Finjan's expert Dr. Min agreed with this order of steps:

> Q: Does a computer that instantiates a scanner before it has determined any programming language of the incoming stream meet Claim 1 or Claim 22 of the '408 Patent?
>
> A: And I -- I just told you. It has to be in response to determining, so it would not meet the scope.

Appx8794-95(216:23-217:5), Appx8788-89(210:24-211:17).

And it follows from the same claim language that the scanner recited in the "instantiating" limitation cannot perform the required "determining." Dr. Min conceded as much:

> Q. The scanner that is instantiated in instantiation step of Claims 1 and 22 can't be the same scanner that is determining the programming language; is that right?
>
> A. … A scanner itself can determine, too, 'cause it says by the computer. It does not preclude the scanner should not do that; but *based on determining, a scanner, another scanner has to be instantiated*. … .
>
> Q. … Is it your belief that the instantiated scanner that includes the parser and the analyzer rules [is] different from the scanner or other module that determines the programming language?
>
> A. Yeah. That's right.

Appx8796(218:2-23) (emphasis added).

Finjan next pivots to other claim language that has nothing to do with the issue. Finjan argues the court's decision conflicts with the broad agreed-to construction of "scanner," which does not limit how the scanner is instantiated. Finjan Br. 31. But the breadth of the isolated term "scanner" does not imply that other claim language can impose no further restrictions. Finjan's logic would nullify not just "instantiating" but also dozens of other words limiting how the "scanner" works. Appx102(19:52-61); *see Mformation Techs., Inc. v. Rsch. In Motion Ltd.*,

764 F.3d 1392, 1399-400 (Fed. Cir. 2014) (rejecting construction that would render other claim language superfluous).

Finjan's arguments also conflict with the intrinsic record. The patent uses "instance" (and its related form, "instantiate") consistently to describe programming-language-specific scanners that are not involved in determining the programming language. *Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1382 (Fed. Cir. 2016) ("The specification's consistent descriptions of" a feature "suggest that the patent's claims do not encompass an embodiment contrary to these descriptions."). The specification mentions scanner "instances" only to describe Figures 6-7. Appx94(3:39-46), Appx99-100(14:65-15:67), Appx91-92(Figs.6-7). Figure 6 shows factory and builder modules that create "instance[s] of each ARB content scanner." Appx100(15:10-39), Appx91(Fig.6). And as Figure 7 shows, each instantiated scanner handles one programming language. Appx100(15:36-43), Appx92(Fig.7). The instantiated scanner never determines the incoming programming language. Instead, the system calls up or creates on demand "an appropriate ARB scanner" once it knows what type it needs. Appx100(15:53-60, 15:14-30).

By contrast, the specification passages Finjan cites describe neither instantiating nor determining. Finjan Br. 32 (citing Appx93(1:66-2:6), Appx95(6:14-24)). Those passages do not use the term "instantiate" or "instance,"

nor do they say which components determine the programming language of incoming content. Appx93(1:66-2:6), Appx94(3:26-28), Appx95(6:14-64). Instead, they simply show the architecture of an individual scanner: "a generic architecture that is language-independent" plus "a set of language-specific rules." Appx95(6:14-24). Finjan cherry-picks quotations to suggest that one scanner might exist first as a "generic architecture" and then be adapted to a specific language after the "determining" step. Finjan Br. 32. But nothing in these passages or anywhere in the specification shows that the "generic architecture" on its own is a "scanner." Appx95(6:14-24). The "generic architecture" is not a scanner but merely a "framework" for generating new language-specific scanners. Appx100(15:41-43); *see* Appx100(15:15-26, 15:39-41) (specifying scanner's content type when creating it).

Even if Finjan's cited passages disclosed a language-independent "scanner," that scanner would not fall within the claim scope for a separate reason. By the claim's plain text, the recited "scanner" must be "for the specific programming language." The claims are thus not drawn to a language-independent scanner, but to a language-specific scanner, such as the ones disclosed in Figures 6-7. *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 708 (Fed. Cir. 2020) ("[When] the patent describes multiple embodiments, every claim does not need to cover every

embodiment. This is particularly true [when] the plain language of a limitation of the claim does not appear to cover that embodiment.").

## II. BECAUSE WILDFIRE'S SERVERS ARE NOT USER DEVICES, THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT THAT PAN DOES NOT INFRINGE THE '633 PATENT

### A. The District Court Correctly Construed "Downloadable-Information Destination"

The district court correctly construed the term "downloadable information destination" to mean a "user device that includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution." Appx10-11.

#### 1. The intrinsic record requires a "downloadable-information destination" to be a "user device"

The words of a claim are generally given their ordinary meaning in the context of the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). But when "the specification … reveal[s] a special definition given to a claim term," "the inventor's lexicography governs." *Id.* at 1316. A specification also gives important context when it "repeatedly and uniformly" describes a claimed feature only one way and "never suggests that" the feature can be "anything other than" how the specification describes it. *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374-75 (Fed. Cir. 2009); *Wi-LAN*, 830 F.3d at 1382 ("The specification's consistent descriptions of" a feature "suggest that the patent's claims

do not encompass an embodiment contrary to these descriptions."). And a specification's "characterizations directed to the invention as a whole" may show the claims "do[] not encompass broader subject matter." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1367-68 (Fed. Cir. 2007).

The district court correctly applied these principles to conclude, based on how the specification consistently uses minor variations of the term, that a downloadable-information destination is a user device. Appx10-11. The term "downloadable-information destination" is not a term of art with one settled ordinary meaning. But as the district court recognized, the specification expressly equates—with quotation marks denoting defined terms—the downloadable-information destination with a user device. Appx65(7:5, 7:58-59); *see* Appx10. First, the specification introduces a system with "one or more user devices or 'Downloadable-destinations'"—thus defining the destination as a "user device." Appx65(col.7:5). Then, reversing the order of the terms, the specification similarly defines a "user device" as the destination and discloses characteristics of that user device/destination:

> A suitable information-destination or "user device" can further include one or more devices or processes (such as email, browser or other clients) that are capable of receiving and initiating or otherwise hosting a mobile code execution.

Appx65(col.7:58-62); Appx10.

Although these passages provide ample support for the district court's construction, there is more: starting with the "Summary of the Invention" the specification consistently explains that the alleged invention protects user devices, like PCs, from malicious "downloadables" (also called "mobile code"). It states that "[t]he present invention provides protection systems and methods capable of protecting a personal computer ('PC') or other persistently or even intermittently network accessible devices or processes from harmful, undesirable, suspicious or other 'malicious' operations that might otherwise be effectuated by remotely operable code." Appx62(2:20-25); *see* Appx49 (similar for Abstract); *Andersen*, 474 F.3d at 1367-68.

The patent further describes protecting user devices by packaging downloadables with protective code before those downloadables go to their destination. Appx65(7:1-21), Appx49(Abstract), Appx52(Fig.1b). The specification then describes that destination as a "user device" where a client executes the packaged downloadable. *E.g.*, Appx63-67(3:51-58 (package is "communicated to and installed by a receiving device or process ('user device')"), 3:62-67 ("the user device receiving a downloadable"), 7:15-21 ("One or more of user devices 145 can further include … clients 146 for utilizing information received via server 140a, in accordance with which MPC and protection policies are operable to protect user devices 145 from detrimental, undesirable or otherwise "malicious"

operations of downloadable information also received by user device 145."), 11:19-25 ("Upon receipt of sandboxed package 340 by a compatible browser, email or other destination-client and activating of the package by a user or the destination-client … .")), Appx52(Figs.1b-1c).

### 2. Finjan shows no error in the district court's construction

#### a. The specification undermines Finjan's interpretation

Finjan's arguments ignore key specification passages and misread others. Finjan Br. 34-38.

Despite having never argued to the district court that "downloadable-information destination" has a plain and ordinary meaning, Finjan now contends that it has one that does not require a "user device." *Compare* Finjan Br. 34, *with* Appx5146-47. But Finjan has no evidence to support its newfound plain and ordinary meaning argument. And the Court should reject Finjan's attempt to side-step the specification. *Phillips*, 415 F.3d at 1313 (holding the specification always provides context for the claims). Here, the specification (1) describes the "present invention" as protecting devices like "personal computers" from malicious downloadables and (2) describes the downloadable destination as a "user device." *Supra* pp.44-45; Appx52(Figs.1b-1c), Appx62-67(2:20-25, 3:51-58, 3:62-67, 7:15-21, 10:61-65, 12:30-32); *see Andersen Corp.*, 474 F.3d at 1367-68; *ICU Med.,* 558 F.3d at 1374-75.

The cases Finjan cites further show why a downloadable destination must be a "user device." Finjan Br. 35 (quoting *Alnylam Pharms., Inc. v. Moderna, Inc.*, 138 F.4th 1326, 1333 (Fed. Cir. 2025); *Sinorgchem Co., Shandong v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007)). Setting a phrase off in quotation marks shows that phrase is being defined, but what Finjan gets wrong is *how* that term is being defined. Take the phrase "[a] suitable information-destination or 'user device'" (Appx65(7:58-59)), which Finjan contends "resolves the issue" (Finjan Br. 34-45). Finjan argues this phrase "plainly defines 'downloadable-information destination' *and* a 'user device' as 'one or more devices or processes (such as email, browser or other clients) that are capable of receiving and initiating or otherwise hosting a mobile code execution.'" Finjan Br. 35 (quoting Appx65(7:58-62); emphasis added). Had the specification sentence included quotes around both terms along with the word "and" instead of "or," Finjan might be correct that both terms were being independently defined by what follows. Instead, the specification says "user devices or '[d]ownloadable destinations'" and "information-destination or 'user device.'" Appx65(7:5, 7:58-62). This shows that the "destination" must be a user device and the "user device" must be a destination. And that matches how "or" and quotation marks are used elsewhere in the specification. The specification says "mobile protection code or 'MPC,'" which means an "MPC" must be "mobile

protection code" rather than anything else that could be so abbreviated. Appx66(9:59-61); *contra* Finjan Br. 35-36.

Recognizing that downloadable destination and user device mean the same thing, Finjan proposes a redefinition of "user device" that strips out any user interaction and covers servers. Finjan Br. 35-36 ("Finjan agrees 'downloadable-information destination' has the same meaning as (1) the *redefined* 'user device' in the specification." (Finjan's emphasis)). It contends that the specification expressly defines "user device" to mean any device "capable of receiving and initiating or otherwise hosting a mobile code execution." Finjan Br. 35-36. But Finjan omits the context from that statement: "A suitable information-destination or 'user device' can *further include* one or more devices or processes (such as email, browser or other clients) that are capable of receiving and initiating or otherwise hosting a mobile code execution." Appx65(7:58-62) (emphasis added). This means that a user device can have additional characteristics. Nothing in the statement suggests that the term "user device" includes devices that are not for users.

Nor do other parts of the specification suggest that "user device" encompasses devices that users do not use. *Contra* Finjan Br. 37-38. In fact, the specification illustrates how "user devices" relate to users. The specification's description of the "present invention" and figure 1 describe protecting a "personal computer." Appx62(2:20-25). The user device can include a client such as user-facing "email"

47

or a "browser," and it can upload or download "user … information."  Appx65(7:58-62), Appx63(3:51-62).

As Finjan points out, the specification says a user device can also be "configurable" to "operat[e] as a firewall/server."  Finjan Br. 37-38; Appx65(7:47-54).  But that just means a user device can operate as a firewall/server—like a mobile phone configured to operate as a firewall or server for other devices.  It does not follow that *any* firewall or server would also be a user device.  Appx24-25.  And the other figures and passages Finjan identifies do not support its redefined "user device"; none suggests the absence of any user interaction.  *Contra* Finjan Br. 37-38 (citing Appx52(Figs.1a, 1c), Appx64(6:26-33), Appx65(7:35-37)).

### b.    The district court sufficiently explained its construction

Trying to impose APA-like requirements on district courts, Finjan contends that the court's construction should be set aside for inadequate reasoning.  Finjan Br. 38-42.  But the district court provided sufficient explanation, and brevity alone provides no basis to set aside a correct construction.

In reviewing a district court's claim construction, this Court "need not decide whether the logic or subsidiary definitions used by the district court to reach the correct construction were sound."  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 809 n.2 (Fed. Cir. 2007); *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1329-30 (Fed.

Cir. 2008).  The Court reviews the district court's conclusion, not its reasoning.  After all, this Court "review[s] judgments, not opinions."  *Id.*[3]

Nor is this case like the precedent Finjan cites.  The district court in *ParkerVision v. Qualcomm* provided neither claim construction nor any analysis of the plain and ordinary meaning.  116 F.4th 1345 (Fed. Cir. 2024); Finjan Br. 39 (discussing *ParkerVision*).  Even though the collateral estoppel question in that case turned on claim scope, the district court "did not undertake claim construction; nor did it analyze the claim language or consult any other intrinsic evidence to determine the scope of the claims asserted."  116 F.4th at 1356.  And because the parties had "not provided [the Court] with claim construction briefing" on appeal, this Court concluded it was "not well-positioned to undertake claim construction in the first instance."  *Id.* at 1360.  Nowhere did *ParkerVision* set forth any of the standards that Finjan would impose on district courts:  that they should expressly state their "own analysis" rather than rely on reasoning from prior opinions and address every argument made.  Finjan Br. 39-40.

---

[3] Unlike here, certain statutes and rules may require tribunals to provide sufficient reasoning:  administrative decisions (*In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016)), bench trials and interlocutory injunctions (Fed. R. Civ. P. 52(a)), and exercises of discretion (*see EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1338 (Fed. Cir. 2025) (en banc)) require adequate explanation.

Here, the district court did what it needed to do. Unlike in *ParkerVision*, it construed the claims; it analyzed the term "downloadable-information destination" and provided an express construction. Appx10-11. It noted both parties' arguments and stated its construction. Appx10-11. It cited the intrinsic record as well as the *Proofpoint* and *Cisco* decisions—both of which in turn provided their own reasoning. Appx10. And no decision of this Court suggests that a district court errs by adopting a prior claim construction order from another court. Appx10-11.

For the same reasons, the district court was under no obligation to provide a detailed explanation for why it adopted the *Cisco* court's construction of the same term over the *Proofpoint* one. Although a prior district court analysis of the same claim term is not dispositive, it should be consulted "[i]n the interest of uniformity and correctness." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008). Regardless, no conflict exists between the three district court constructions. Although the court in *Proofpoint* did not include "user device" in its construction, neither party appeared to place that issue in dispute for purposes of infringement or validity. *See* 2015 WL 7770208, at *5. The *Proofpoint* court thus did not need to decide the "user device" part of the construction. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (claim terms should only be construed "to the extent necessary to resolve the controversy"). Here, by

contrast, the inclusion or not of "user device" matters to whether PAN's WildFire infringes.  Appx8724-30(¶¶715-19).

**B.  The District Court Correctly Granted Summary Judgment Because Finjan Offered No Evidence That WildFire Servers Provide User Interaction**

Finjan also argues that it could show infringement under the district court's construction.  But Finjan never pointed to any evidence that the accused WildFire server is a "user device."

Finjan argued that WildFire's servers (Public Cloud Server or WF-500) that run virtual machines on WildFire's back end meet the "downloadable-information destination" claim requirement.  Appx8926(¶¶383-84); Appx24.  Yet Finjan's expert Dr. Keromytis did not—and could not—state that those servers are a "user device" as required by the claims and the district court's construction.  At most, he said a WildFire server *could* be a user device.  Parroting Finjan's infringement contentions, he opined:

> WildFire is a downloadable-information destination because *it is a device*—a user device *or otherwise*—that includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution.

Appx8924-25(¶381) (emphasis added); Appx24.  All this statement says is that the WildFire server "is a device," not that it is a user device.

Regardless, this conclusory statement would fail to create a fact dispute, even had Dr. Keromytis unequivocally stated that the WildFire server is a "user device." *Contra* Finjan Br. 44-45; *see* Appx24-25. First, Dr. Keromytis offered no reasoning on how the WildFire servers relate to users. Appx8924-79(¶¶380-467); *see TechSearch*, 286 F.3d at 1372 (an expert's "unsupported or conclusory averments are insufficient to avoid summary judgment"). Second, he applied the wrong claim scope. *TechSearch*, 286 F.3d at 1373-74 (affirming summary judgment because patentee's expert "fail[ed] to recognize [a] claim requirement"). Dr. Keromytis defined a "user device" as just "a device or process for receiving." Appx10587(138:9-15); *accord* Appx8924 n.87 (Keromytis report). By not applying the district court's construction, Dr. Keromytis' testimony offered no evidence from which a factfinder could find that the WildFire servers are a "user device." *See Cordis Corp. v. Bos. Sci. Corp.*, 658 F.3d 1347, 1357-58 (Fed. Cir. 2011) (affirming district court's disregard of expert testimony that applied an erroneously broad reading of the claims).

PAN's expert Dr. Rubin, by contrast, applied the correct construction and explained that the WildFire servers are not "user devices." Appx25; Appx8724-30(¶¶715-19). "WildFire is a 'cloud location,' in a separate networked location from any user device." Appx8728-29(¶718). And "WildFire virtual machines are

implemented as a cloud based solution, and are not devices which provide direct user interaction, let alone being client endpoint devices." Appx8727-28(¶718).

Finally, Finjan argues the district court failed to apply the *Cisco* court's purportedly "broad" construction of "user device"—that is, one that does not require users. Finjan Br. 45; *see* Finjan Br. 43-44. Yet that argument simply rehashes Finjan's flawed claim construction argument that "user device" means *any* receiving device. *Supra* pp.47-48.

## III. BASED ON FINJAN'S EXPERT'S FAILURE TO IDENTIFY A "SECURITY PROFILE" IN WILDFIRE, THE DISTRICT COURT CORRECTLY CONCLUDED PAN DOES NOT INFRINGE THE '731 PATENT

The asserted claims of the '731 patent all require a "security profile" that meets two requirements: (1) the "security profile" must "comprise[] a list of computer commands" (Appx47-48(11:39-42, 13:6-7, 13:31-32)), and (2) that security profile must be stored in a "security profile cache," which the district court construed as "a memory for temporarily holding a security profile" (Appx47-48(13:12-13, 13:37-38, 11:46-47); Appx26 n.3). Finjan's expert failed to testify that a security profile is temporarily stored or that WildFire's non-temporary storage is equivalent to the patent's temporary storage.

**A.    The District Court Correctly Rejected Finjan's Literal Infringement Theory Because No "Security Profile" Is Stored In A Cache**

**1.    Finjan's expert identified different WildFire elements for each "security profile" requirement**

The district court correctly granted summary judgment because Finjan presented no evidence that any aspect of WildFire meets *both* "security profile" claim requirements.    For the "list of computer commands," Finjan's expert Dr. Jakobsson relied on the WildFire Reports.    But for the "security profile cache," he shifted to something entirely different:  "scan results" or "analysis results."

*"Security profile" comprising "a list of computer commands"*:    As the district court recognized, Dr. Jakobsson pointed to the WildFire Reports for the "security profile" requirement.    Appx26.[4]    He explained that WildFire generates downloadable reports where users can view information about a scanned file. Appx9039-48(¶¶664, 667).    Dr. Jakobsson opined that these reports include a "behavior summary" (also called "behavioral summary") "comprising a list of computer commands."    Appx26; *see* Appx9034-35(¶658) ("WildFire … provide[s] a report listing the behaviors (i.e., 'Behavior Summary'), which correspond to a list of computer commands … .").    This behavior summary shows what actions a file took when it went through dynamic analysis:

---

[4] Finjan previously relied on another output, "AV Signatures," as the "security profile," but Finjan has abandoned that theory.  Appx11741(36:12-22); *cf.* Appx26.

**BEHAVIORAL SUMMARY**

This sample was found to be malware on this virtual machine.

| Behavior | Severity |
|---|---|
| ▸ Created a file in the Windows folder | |
| ▸ Connected to a non-standard HTTP port | |
| ▸ Created or modified a file | |
| ▸ Started a process | |
| ▸ Injected code into another process | |
| ▸ Modified the Windows Registry to enable auto-start for a file in a user folder | |
| ▸ Modified the Windows Registry to enable auto-start | |
| ▸ Modified the Windows Registry | |
| ▸ Modified Internet Explorer security settings | |
| ▸ Modified proxy settings for Internet Explorer | |
| ▸ Modified connections settings for Internet Explorer | |
| ▸ Used the HTTP POST method | |
| ▸ Attempted to sleep for a long period | |
| ▸ Connected directly to an IP address over HTTP | |
| ▸ Created an executable file in a user folder | |

Appx9034-35(¶658); Appx9044-45(¶665); *supra* pp.5-6 (explaining dynamic analysis).

In his expert report and deposition, Dr. Jakobsson frequently switched between different terms when describing these reports. Appx9008-92; Appx9139-62. Still, he only ever relied on a specific WildFire output—the downloadable reports containing behavior summaries. In places, he called them the "WildFire Reports." Appx9039-44(¶664) (showing behavior summary as part of what PAN documentation calls the "WildFire Report"). He also called them "WildFire Analysis Reports" (Appx9037(¶662), Appx9045-48(¶667); Appx9150), "detailed behavioral report[s]" (Appx9020-21(¶635)), "detailed forensics report[s]"

(Appx9020-24(¶¶634, 640-42)), and sometimes just "report[s]" (Appx9034-35(¶658)). Each referred to the same report that includes the behavior summary.

*"Security profile cache":* Because Dr. Jakobsson identified only the WildFire Reports as corresponding to the "security profile" required by the claims, Finjan had to show those *same* reports were stored in a "security profile cache." But as the district court explained, Finjan offered no evidence the WildFire Reports are stored in a cache—i.e., temporary storage—and "effectively abandon[ed]" any argument they are. Appx26 & n.3. That decision is correct. Dr. Jakobsson identified only one temporary storage location in WildFire: Local DB. Appx9069-70(¶812). He never opined that the WildFire Reports are stored there. *See* Appx8689-91(¶¶363, 366) (PAN's expert noting this failure). At most, he vaguely opined that "scan results or analysis reports" may be stored in various locations, including "in a database, such as Local DB, Central DB, Virus Database, or in disk storage." Appx9067(¶806).[5]

Instead, Dr. Jakobsson shifted away from the WildFire Reports entirely when he addressed what gets stored in the "security profile cache." Appx27. He opined that WildFire stores the "scan results" and "analysis results" in Local DB.

---

[5] Before the court had construed "cache" to require temporary storage, Finjan's expert discussed other storage locations in his report: "Central DB, Virus Database, or … disk storage." Appx9067(¶806). PAN's expert, Dr. Rubin, confirms that these other storage locations are not temporary, and Finjan does not rely on them now. Appx8677-78(¶¶334-35), Appx8689-90(¶¶363-64); *see* Finjan Br. 56-57.

Appx9082-85(¶¶825-26, 828). The district court correctly rejected that argument: "Other than baldly asserting such 'scan' and 'analysis' results are 'security profiles,' however, Finjan and its expert offer no support for why they should be deemed as such." Appx27. Nowhere did Dr. Jakobsson explain what "scan results" or "analysis results" are—much less explain how they meet the requirements of the recited "security profile" by comprising a "list of computer commands."

### 2. Finjan fails to show that PAN "misled" the court or that the evidence supporting its "scan/analysis results" theory was sufficient all along

#### a. Finjan never presented a unified "WildFire Reports"-"scan/analysis results" theory

Because it has no evidence that WildFire stores WildFire Reports in temporary storage, Finjan tries misdirection: that PAN misled the district court into believing that Finjan had a separate infringement theory based on the WildFire Reports. Finjan Br. 48-52. And it asks this Court to stitch its WildFire Reports theory together with evidence about scan/analysis results. Finjan Br. 52-53.

But Finjan's expert articulated a WildFire Reports theory. Finjan's expert pointed exclusively to the behavior summary in WildFire Reports when he tried to show "a list of computer commands." *Supra* pp.54-56. Finjan now suggests that Dr. Jakobsson never used the term "WildFire Reports," saying PAN's expert coined that term. Finjan Br. 48, 50. Yet Dr. Jakobsson's own report refutes Finjan's argument. Dr. Jakobsson's expert report showed a screenshot of documentation

entitled "WildFire Report Contents," which states that those contents include the "behavior summary." Appx9039-44(¶664).

Finjan also argues that where Dr. Jakobsson discussed the scan/analysis results, PAN's expert misidentified those results as WildFire Reports. Finjan Br. 48-50. Finjan presents three supposed examples where PAN and its expert called the scan/analysis results WildFire Reports. But in each, PAN and its expert were addressing Dr. Jakobsson's discussion of "*reports*." Appx9067(¶806) ("analysis reports"), Appx9068(¶809) ("a report"), Appx9071-73(¶815) ("Wildfire detailed behavioral reports"). Indeed, Finjan—not PAN—drew the distinction between WildFire Reports and scan/analysis results. *Contra* Finjan Br. 50-52. For example, Finjan's expert relies on an "analysis report *based on* the scan results" and a "detailed forensics report *pertaining to* the scan results." Appx9037(¶662) (emphasis added), Appx9020(¶634) (emphasis added); *accord* Appx9067(¶806), Appx9067-68(¶808), Appx9071-73(¶815).

Finjan now asks this Court to treat WildFire Reports and scan/analysis results as one infringement theory, arguing the "security profile" claim requirement is met that way. Finjan Br. 52-53. But Finjan forfeited this argument. Nowhere in its district court briefing did Finjan argue that the reports and scan results are a unified theory. Appx10407-09. At most, Finjan asserted at the oral hearing that WildFire reports and scan/analysis results are "all the same thing" just because they are what

"comes out of WildFire after it has analyzed the suspicious code."
Appx11746(41:12-18). The district court was under no obligation to consider that
belated theory to which PAN had no meaningful opportunity to respond. *Power
Analytics Corp. v. Operation Tech., Inc.*, 820 F. App'x 1005, 1013 (Fed. Cir. 2020).

Even now, Finjan does nothing to show these different terms refer to the same
WildFire output. Finjan identifies no documentation or non-conclusory testimony
explaining what scan/analysis results include or equating them with any type of
report or behavior summary. *See* Finjan Br. 46-57; *infra* pp.61-62. Nor is it enough
that WildFire Reports and scan/analysis results both "come[] out of WildFire after
it has analyzed the suspicious code," as Finjan asserted for the first and only time at
the hearing. Appx11746(41:12-18). WildFire scanning produces different types of
outputs, including reports and signatures. Appx9020-36(¶¶634, 640, 659). Just
because these outputs all come out of WildFire does not automatically mean they
are the same and can meet both requirements of a "security profile."

> **b.** **Finjan's evidence does not show that "scan/analysis results" meets all requirements of a "security profile"**

Finjan argues that, even if WildFire Reports and scan/analysis results are
different theories, the scan/analysis results theory alone suffices to show
infringement. Finjan Br. 54-57.

The district court correctly ruled that Finjan forfeited this argument. Appx27.
Across its summary judgment briefing and expert report, "Finjan previously

identified only WildFire Reports and AV Signatures as potentially constituting 'security profiles'"—i.e., as "compris[ing] a list of computer commands." Appx27; Appx10407-09; *supra* pp.54-56.

Finjan cannot show the district court abused its discretion. Finjan says it argued scan/analysis results include a "list of computer commands" at the summary judgment hearing and tries to blame its delay on PAN. Finjan Br. 55 n.8. But even at the summary judgment hearing, Finjan still offered "no support for why" "such 'scan' and 'analysis' results are 'security profiles.'" Appx27. Finjan entirely omitted the evidence it now cites trying to link behavior summaries to "scan results." *Compare* Appx11746-51(41:11-46:12), *with* Finjan Br. 54 (citing Appx9020-24(¶¶634, 640-42)).

And PAN's summary judgment motion put Finjan on more than enough notice of the evidence it needed to put in its response. *Contra* Finjan Br. 55 n.8. PAN argued "Finjan cannot prove that WildFire includes 'security profiles'" (i.e., profiles comprising a list of computer commands) that are "stored in a 'security profile cache.'" Appx8590. Finjan's burden was thus to identify evidence of a WildFire element that met both requirements. Yet for scan/analysis results, Finjan ignored the first and focused only on the latter requirement. Appx10407-09.

Even if this Court reaches Finjan's argument, it still fails. Nowhere did Dr. Jakobsson explain what "scan results" or "analysis results" are—much less how

they meet the requirements of the recited "security profile" by comprising a "list of computer commands." Whereas Dr. Jakobsson was able to present PAN documentation identifying "WildFire reports" as a specific output that includes behavior summaries, Appx9039-44(¶664), he presented no such documentation showing behavior summaries are included within anything called a "scan result" or "analysis result." Indeed, Dr. Jakobsson's "list of computer commands" section of his expert report did not even use the term "analysis result." Appx9010-49(¶¶620-740).

Finjan now scours the record for evidence that the scan/analysis results "comprise[] a list of computer commands." Finjan Br. 54 (citing Appx9020-24 (¶¶634, 640-42)). But what Finjan finds creates no dispute of fact. It cites testimony only that WildFire "creat[es] a detailed forensics *report* pertaining to the scan results" and that the "detailed forensics *report*"—not the scan results—"summarizes the observed behaviors." Appx9020-24(¶¶634, 642) (emphasis added). Finjan also points to its expert's mention of "scan results (i.e., the security profiles derived by the scanner including a list of computer commands … )." Appx9082(¶826) (quoted at Finjan Br. 56). But Dr. Jakobsson provides no citation, evidence, or other explanation of what he means. *See* Appx9082(¶826), Appx9068-73(¶¶810, 815). Without documents or reasoning to show that WildFire's list of behaviors is

contained within anything called "scan results," Dr. Jakobsson's conclusory testimony cannot defeat summary judgment. *TechSearch*, 286 F.3d at 1372.

## B.    The District Court Correctly Rejected Finjan's Doctrine-Of-Equivalents Evidence, Which Does Not Fill The Gap In Its Literal Infringement Case

Because Finjan's doctrine-of-equivalents evidence failed to address the claims' temporary storage requirement, the district court correctly rejected this underdeveloped argument. Appx27 n.4.

The Supreme Court has held that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). To defeat summary judgment against a doctrine-of-equivalents theory, a patentee must present "particularized testimony and linking argument" of equivalence "on a limitation-by-limitation basis." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1328-29 (Fed. Cir. 2007) (emphasis and quotation omitted).

Applying these principles, this Court has repeatedly held that a patent owner fails to satisfy the doctrine of equivalents by addressing some claim requirements while ignoring others. That was the patentee's problem in *Gemalto S.A. v. HTC Corp*, 754 F.3d 1364 (Fed. Cir. 2014). The claims as construed required storing all application memory on the same chip as a processor. *Id.* at 1368. The patentee

attempted to show that storing *nearly* all instructions in a *temporary* on-chip cache was equivalent. *Id.* at 1373. But its "expert testimony only addresse[d]" equivalence for one claim requirement: "the difference between having 100% or 97% of program instructions stored on-chip." *Id.* at 1374. The expert failed to address the other requirement: "the underlying difference between temporary and permanent storage." *Id.* This Court affirmed summary judgment of no doctrine-of-equivalents infringement. *Id.* at 1375; *see VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1343-45 (Fed. Cir. 2023) (reversing JMOL denial for similar reason).

Here, the limitation Finjan tried to meet with the doctrine of equivalents is "security profile cache." *See* Appx9091-92(¶¶861-64). Finjan needed equivalence to temporary storage, which the district court's construction requires. Appx26 n.3; Appx5-7. On literal infringement, Finjan's expert opined only that reports could be stored in various memories, many of which are not temporary. Appx9067-70(¶¶806, 812); Appx8677-78(¶¶334-35). The district court therefore granted summary judgment of no literal infringement. Appx26-27. To overcome the gap in its literal infringement case, Finjan had to present an equivalent to the missing limitation: it needed evidence that WildFire's non-temporary databases are equivalent to temporary storage. The specification offers guidance on what functions Finjan's expert should have addressed. It explains cache functionality in contrast with that of more permanent memory: a cache provides quick access to reduce latency, and

it gets purged regularly to make way for new files.  Appx8700-01(¶440) (citing Appx42(1:58-60), Appx45-46(8:11-39, 10:9-12)); *see* Appx7 (acknowledging this purpose).

The district court correctly concluded that Finjan's doctrine-of-equivalents theory was "too underdeveloped to give rise to a triable issue of fact."  Appx27 n.4. Finjan's expert made no attempt to address the temporary storage requirement.  He did not even acknowledge it, relying instead on Finjan's rejected construction that a "cache" stores information "at[]least temporarily."  *Compare* Appx9092(¶862), *with* Appx5-7; *Wiener v. NEC Elecs., Inc.*, 102 F.3d 534, 542 (Fed. Cir. 1996) (expert declaration applying overbroad claim interpretation could not create a factual dispute about equivalency).

Nor did Finjan's expert offer any explanation for how any WildFire non-cache memory could provide the same function, way, and result as the cache described in the '731 patent.  *See* Appx9091-92(¶861-64).  As PAN's expert explained—and Finjan never confronted—WildFire's databases differ from the recited cache because they provide persistent storage for later use and reference.  Appx8699-702(¶¶438-42) (PAN's expert).  Although Finjan's expert addressed other claim requirements, he merely opined in a conclusory fashion that WildFire provides the same function, way, and result because of what gets stored in the memory and how

the memory is indexed.  Appx9091-92(¶861-64).  Without more, Finjan's equivalents argument would vitiate the temporary storage requirement.

Finjan's appeal argument does not address this gap in its expert's testimony. Finjan Br. 57-59.  Nor could it.  The testimony Finjan needs is simply missing. Finjan only ever argued the temporary storage requirement was literally met. Appx10412-13 ("Dr. Jakobsson described … how PAN's accused products include temporary storage … .").  All Finjan now agues is that its expert offered a "similar level of detail" as in in *Charles Machine Works*.  Finjan Br. 57-59 (citing *Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1380 (Fed. Cir. 2013)).  But detail on one claim element cannot fix the missing detail on another.

### C.  The District Court Correctly Construed "File Cache" And "Security Profile Cache" To Exclude Permanent Memory

#### 1.  The district court correctly assessed the ordinary meaning of "cache"

The district court correctly construed "cache":  "file cache" is "a memory for temporarily holding a file," and "security profile cache" is "a memory for temporarily holding a security profile."  Appx5-7; Appx26 n.3.  This construction follows from the term's ordinary meaning and its use in the patent.

"Cache" is a term of art.  As both Finjan and PAN agree, the term refers to a category of computer memory.  Finjan Br. 60 (citing Appx7727-28(9:20-10:2)); Appx7719-801.  To those of skill in the art, a "cache" is defined by its specialized

use for temporary storage. Appx5585-86(¶81) (PAN's expert). Finjan's prior statements and its own extrinsic evidence confirm this meaning. Finjan explained in its case against Blue Coat Systems: "'Caching' relates to the use of a cache (i.e., temporary storage)." Appx5984; Appx5974-6003. And Finjan introduced the "Cache (computing)" Wikipedia article in its deposition of PAN's expert. Appx6004-14; Appx6015-27. That article describes a hardware "cache" as "memory for temporary storage of data likely to be used again." Appx6006. It also discusses cache entries being "removed in order to make room for the newly retrieved data," rather than stored indefinitely. Appx6007; Appx6025-26(132:20-133:11).

In the '731 patent, "cache" has this ordinary meaning. The specification describes the importance of keeping the caches current. Appx45(8:11-47). Old files get replaced or purged periodically, and files' security profiles get updated periodically. Appx45(8:23-49). An up-to-date cache at a gateway allows content (for example on a web page) to be loaded quickly from there rather than being retrieved from another location. Appx42(1:64-67), Appx46(10:9-12).

## 2. Finjan fails to identify intrinsic record support to depart from the ordinary meaning of cache

Finjan starts by again asking this Court to grade the district court's opinion. Finjan suggests this court should vacate the district court's claim construction opinion for not expressly addressing intrinsic evidence. Finjan Br. 59-60. But none

of Finjan's cited authorities supports vacating an otherwise correct construction on this basis. *Supra* pp.48-49. And the district court did more than enough when it addressed the arguments the parties raised and stated its construction clearly. Appx5-7; Appx26 n.3.

On the merits, none of Finjan's arguments or evidence justifies departing from the ordinary meaning of "cache." Finjan argues claim differentiation requires the claim 1 cache to encompass indefinite storage, since claim 4 adds that "a file is purged from the file cache after an expiration period." Finjan Br. 60-61; Appx47(11:62-64). But the district court's construction does not violate the claim differentiation principle. Files can be stored temporarily many ways without being "purged from the file cache after an expiration period." In column 8, the specification presents several such alternatives, which include purging based on other factors (e.g., "the least accessed files") and "replacing" or "updat[ing]" cache contents. Appx45(8:23-39). That makes claim 1 broader than claim 4 because it encompasses embodiments where files are not "purged from the file cache after an expiration period" but are still stored temporarily. Regardless, even if those alternatives did not exists, "[c]laim differentiation is a guide, not a rigid rule." *Wi-LAN*, 830 F.3d at 1391.

The same specification passage shows why Finjan's other arguments are wrong too. The specification discloses conditions for purging or updating cache

contents (e.g., "web content has changed" or the caches become full). Finjan argues that "none of these conditions are guaranteed to occur," so a cache might happen to store contents indefinitely. Finjan Br. 61-62 (citing Appx45(7:22-26, 8:40-43); Appx6022(125:15-20)). But the mere possibility of that happenstance does not suggest "cache" encompasses permanent storage or meet the high bar for departing from a term's ordinary meaning. *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015) ("[R]edefinition or disavowal is required where claim language is plain, lacking a range of possible ordinary meanings in context."); *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1368 (Fed. Cir. 2016) ("fleeting references" to a possibility outside the plain meaning are not enough). All temporary storage may hold files longer or shorter depending on what conditions might occur, and that does not mean that the ordinary meaning of "cache" encompasses memory meant for permanent storage. Regardless, Finjan ignores other conditions that are guaranteed to occur: a periodic schedule or an "expiration date." Appx45(8:23-33).

Finjan also argues the district court's concerns with its proposed construction were unfounded. Finjan Br. 63-64. As the district court noted, Finjan's construction appears to "encompass[] any kind of memory." Appx6. Finjan now argues—for the first time—that its proposed construction excludes memory capable of storing data only permanently, such as read-only memory. Finjan Br. 63. But Finjan never made

this argument to the district court. And nothing in the words of Finjan's proposed construction suggests that read-only memory would be excluded when other memory capable of indefinite storage would be included. The district court cannot be faulted for rejecting the construction Finjan actually presented to it. *Digital-Vending*, 672 F.3d at 1273 ("[A] party may not, as a general rule, change the scope of its claim construction on appeal."). And the district court's concern was valid— if the drafter meant to encompass *all* memory, they would not have chosen the term "cache," which the parties agree a skilled artisan would understand as a specific type of memory.

Finally, the district court correctly adopted a construction that refers to the intended function of the "cache." Appx5-7. Finjan argues the construction would make infringement turn on how the apparatus is later put to use. Finjan Br. 63 (quoting *Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*, 998 F.3d 917, 920-21 (Fed. Cir. 2021)). But infringement under the district court's construction does not depend on how the cache is later used. The construction requires "a memory *for* temporarily holding a file." Appx5-7. Infringement turns on whether the memory is configured to store a file temporarily (rather than indefinitely)—not on how long a file is later stored there. *See Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 41 (Fed. Cir. 2020) (the term "a signal generator configured to generate" refers to how the signal generator is programmed).

Nor does *Edgewell* (the case Finjan relies on) set a rigid bar against functional constructions. 998 F.3d at 920-21. This Court has explained it is "entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language." *ICU Med.*, 558 F.3d at 1375-76 (construing "spike" as "an elongated structure having a pointed tip *for piercing the seal*"). And unlike mechanical claims as in *Edgewell*, functional claiming is the norm for software patents. *Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326, 1336 (Fed. Cir. 2022) ("It appears that 'buffer' should be given the ordinary meaning … : 'temporary storage for data being sent or received.'").

## CONCLUSION

The district court's judgment should be affirmed.

Dated: October 23, 2025

Respectfully submitted,

/s/ Brian R. Matsui

TIMOTHY CHEN SAULSBURY
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

KYLE W.K. MOONEY
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

BRIAN R. MATSUI
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8784
BMatsui@mofo.com

REBECCA W. SETRAKIAN
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

*Counsel for Palo Alto Networks, Inc.*

**CERTIFICATE OF CONFIDENTIAL MATERIAL**

I hereby certify that the foregoing filing complies with the confidential word count limitation set by Federal Circuit Rule 25.1(d)(1) because it contains four unique words and one figure marked as confidential. To the extent the Court's word count limitation applies to words in a figure, this filing complies because it is accompanied by a motion under Federal Circuit Rule 25.1(d)(3) to exceed the word count limitation.

Dated: October 23, 2025

<u>                    /s/ Brian R. Matsui                    </u>
Brian R. Matsui

**CERTIFICATE OF COMPLIANCE**

The foregoing filing complies with the relevant type-volume limitations and typeface and type style requirements of the Federal Rules of Appellate Procedure and the Federal Circuit Rules because it has been prepared using a proportionally spaced typeface and includes 13,906 words, excluding the parts of the filing exempted by the Rules.

Dated: October 23, 2025           /s/ Brian R. Matsui
                                                  Brian R. Matsui

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system on October 23, 2025.

I further certify that, on October 23, 2025, and with consent of counsel, I served the confidential version of this filing via email on the following counsel of record:

Juanita R. Brooks (brooks@fr.com)

Roger A. Denning (denning@fr.com)

Jared A. Smith (jasmith@fr.com)

Lawrence Jarvis (jarvis@fr.com)

Joe R. Dorris (dorris@fr.com)

James H. Young (jyoung@fr.com)


Dated: October 23, 2025

/s/ Brian R. Matsui
Brian R. Matsui